**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **25-cr-048 (AHA)** |
| **PAUL DIXON MICKENS** | : | |

**DEFENDANT'S SUPPLEMENT TO**
**MOTION TO SUPPRESS TANGIBLE EVIDENCE**

Pending before this Honorable Court is Paul Dixon Mickens's motion to suppress evidence seized from his car on November 26, 2024, in violation of his Fourth Amendment rights. ECF 9. On that date, Mr. Mickens's car was seized by police officers no later than when four police cars and at least eight officers were surrounding the car for approximately twenty minutes waiting on K9 units. Because the government has failed to meet its burden of demonstrating that police had probable cause—or even a reasonable articulable suspicion—to support the seizure of the car, the Court must suppress the evidence found in the car. The evidence also must be suppressed because the police broke into and searched the car without probable cause to believe the car contained contraband. Before the police entered the car, Officer John Thurman deployed K9 Oleg on the car and reported that Oleg alerted for the presence of narcotics, but the government failed to meet its burden to demonstrate that K9 Oleg was properly trained and reliable, or that the alert was sufficient to establish probable cause based on the circumstances known to the officers.

**Procedural Background**

On November 26, 2024, officers of the Metropolitan Police Department ("MPD") seized and then searched a gray Infiniti registered to Mr. Mickens. According to police officers, in a

backpack found in the backseat of the car, they found a handgun, and in a pill bottle in the center console, they found a substance that field tested positive for cocaine. On December 6, 2024, police sought and obtained a D.C. Superior Court arrest warrant for Mr. Mickens on the charge of "unlawful possession of a firearm (prior conviction)." Mr. Mickens, who was unaware of the warrant, was arrested at his place of employment on January 8, 2025. The government then filed a complaint in Superior Court, charging Mr. Mickens with one count of possession of a firearm by a person previously convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 22 D.C. Code § 4503(a)(1). On February 26, 2025, a grand jury returned a one-count indictment in this matter charging Mr. Mickens with the same offense but under the federal code—unlawful possession of a firearm by a person previously convicted of a felony, in violation of 18 U.S.C. § 922(g).

Mr. Mickens filed his motion to suppress on April 2, 2025, ECF 9, and the government filed a written response on April 23, 2025, ECF 10-2. At an evidentiary hearings on the motion on July 11, 2025, the government offered testimony from Officer Aaron Dabney. Tr. 7/11/2025 at 15-174. The Court continued the hearing to July 18, 2025, when the government offered testimony from Officer John Thurman and the defense offered testimony from Dr. John Sagebiel, an expert in the field of detection dog training, deployment, and reliability. Tr. 7/18/2025 at 5-140, 148-210. The defense also sought to present the testimony of an investigator, Tyrees Smith, who was unavailable on that date. Rather than schedule a third evidentiary hearing, the Court instructed defense counsel to present Mr. Smith's testimony through an affidavit. *Id.* at 217. That affidavit is attached here as Defense Exhibit 300.

## ARGUMENT

Law enforcement violated Mr. Mickens's Fourth Amendment rights in two different ways. First, officers seized his vehicle without reasonable suspicion or probable cause. Second, they conducted an unlawful search of his vehicle without probable cause. Because of the greater interest the Court expressed in the second question during the suppression hearing, Mr. Mickens begins with that question first.

### I. Police Unlawfully Searched Mr. Mickens Car without Probable Cause

#### a. Dog "Alert" Did Not Provide Probable Cause

An alert by a drug-sniffing canine can only provide probable cause to search if the government can prove that the canine is well-trained, reliable, and was not improperly cued by its handler. *Florida v. Harris*, 568 U.S. 237, 346-48 (2013). The government has failed to do so here. As the Court in *Harris* explained, "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 248. No reasonably prudent person would believe that K9 Oleg's alert supported a finding that a search of the car would reveal contraband given (1) Oleg's lack of proper and independent training; (2) Officer Thurman's method of deployment and rewards; (3) Oleg's conduct when deployed on Mr. Mickens's car; (4) the video of Oleg's deployment in January 2025; and (5) Oleg's long history of unreliability when deployed. The expert testimony from Dr. John Sagebiel further confirms that the government has failed to meet its burden of demonstrating that Oleg is reliable.

### 1.  Insufficient Training

Officer Thurman testified that he has been with the MPD K9 unit for approximately six years. Tr. 7/18/2025 at 6. K9 Oleg is the only MPD dog that Officer Thurman has handled, and Officer Thurman is the only handler that K9 Oleg has had. *Id.* at 9, 46-47. K9 Oleg was not trained to detect narcotics until May 2022. *Id.* at 7. Prior to that time, Officer Thurman and K9 Oleg were trained only for patrol. *Id.*

In May 2022, they completed an eight-week, 320 hour "Basic Narcotics Detector Dog Training Course" through the MPD's Special Operations Division. *Id.* at 8; Gov't Ex. 14 (May 27, 2022). The only written records of Oleg's training are a certificate of completion on May 27, 2022 and a one-paragraph note regarding testing completed on that date. Gov't Ex. 14; Def. Ex. 2-001; Tr. 7/18/2025 at 69. The government has indicated that more detailed records of Oleg's training do not exist. *See* Tr. 7/18/2025 at 61; ECF 15 at ¶ 3. This is in sharp contrast to other cases where the government has produced detailed records, including the syllabus, daily summaries of the class activities, and notes of the progress made by the dog and the handler. *See* Def. Ex. 47 & 48 (class syllabus and notes for two MPD firearm dogs).[1]   During his testimony, Officer Thurman gave a very general overview of what occurred during the class, but could not explain basic details such as where the odors that were used for training were obtained, the method of the training, or information regarding his and Oleg's progress during the class. Tr. 7/18/2025 at 59, 63, 66-67. With no record of how Oleg and Officer Thurman were trained, who trained them, or how they did in their class, the government has not met its burden to

---

[1]Defense Exhibits 47 and 48 are submit not as substantive evidence—because they related to training to detect firearms, not narcotics—but as examples of detailed notes maintained by MPD in relation to detection dog classes.

demonstrate this K9 team is "well-trained." *Cf. United States v. Acosta*, No. 18-CR-2050-CJW, 2019 WL 454247, at *15 (N.D. Iowa Feb. 5, 2019) (finding dog unreliable and explaining, with respect to unproduced deployment records, that "[t]he Court should not be left to speculate about what those records show or how Defendant may have used them to question [the canine's] credibility").

As one court recently explained:

> In allowing a K9's indication, or even its alert, to serve as a basis for finding probable cause to search an individual's personal property, we, as a society, are placing an enormous amount of trust, and indeed our very civil liberties, in the responses of creatures that have limited ability to communicate with us. It is therefore imperative that a K9 be meticulously trained so that we can be assured that its signals are clear and direct and that we, as a community, can be confident in the reliability of the message that the K9 is communicating. The Tenth Circuit has recognized that in assessing the reliability of a K9, ''courts typically rely on the dog's certification.'' *Ludwig*, 641 F.3d at 1251. The courts have consistently recognized that that (sic) the training necessary to support certification must be completed successfully, that the certification must be current and updated through ongoing training, *and that both must be supported by accurate and timely kept records*.

*United States v. Jordan*, 455 F. Supp. 3d 1247 (D. Utah 2020) (emphasis added) (finding government failed to establish probable cause where training deficient and no objectively identifiable alert).

Office Thurman and K9 Oleg's lack of independent training also demonstrates that the government has failed to meet its burden. The only narcotics detection training Officer Thurman and Oleg received was through MPD's Special Operation Division. Tr. 7/18/2025 at 49, 72. They

have had no training or certification by any independent organization.[2] *Id.* In *Harris*, the Court

noted, "If a bona fide organization has certified a dog after testing his reliability in a controlled

setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert

provides probable cause to search." 568 U.S. at 246-47. Unlike in *Harris*, here, there was no

independent certification by a bona fide organization—MPD certified its own dog. Tr. 7/18/2025

at 49. With no independent certification, the government has not met its burden of demonstrating

that Oleg was reliable. *See United States v. Summers*, 153 F. Supp. 3d 1261 (S.D.Cal. 2015)

(finding government failed to establish probable cause where no independent agency certified

detection dog, training records were not reliable, and alert behavior challenged).

The *Harris* Court noted a dog may be reliable even in the absence of formal certification,

as law enforcement has an incentive to use effective training because "accurate drug-detection

dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited

time and resources." *Id.* at 247. While that may be true when a detection dog is deployed in an

area to locate places for officers to search, such as at a border-crossing or in a detention facility,

that reasoning does not apply here. All but one of K9 Oleg's deployments were on vehicles when

officers had some suspicion of narcotics in the vehicle already but needed a dog sniff to provide

the probable cause to search it. *See* Def. Ex. 1. In other words, when Oleg is deployed officers

are on the scene and have the resources, time, and desire to search, but they have no lawful

---

[2] Officer Thurman testified that the training by MPD is based on "narcotics training standards by
the United States K9 Police Association" ("USPCA") and that two individuals from this
association along with one of the MPD trainers judged the examination for their initial
certification. Tr. 7/18/2025 at 10. That training, however, was conducted by MPD, not the
USPCA. *Id.* at 49-50. The certification is signed only by MPD officials, as is the training note for
May 27, 2025, the date of certification. *See* Gov't Ex. 14; Def. Ex. 2.001.

authority. K9 Oleg is deployed to provide that authority, and MPD has a strong interest in obtaining alerts to permit their officers to search, regardless of reliability. MPD also has a substantial financial investment in Oleg, Tr. 7/18/2025 at 48, providing additional incentive to ensure that he is useful to their officers in obtaining authorization to search, again regardless of reliability.

Although Officer Thurman testified that Oleg's training is consistent with USPCA standards, *see* Def. Ex. 15; Tr. 7/18/2025 at 10-12, 71-72, the records do not support that claim. The only record of testing on May 27, 2022—the date Oleg and Officer Thurman were certified—is the one-paragraph report. *See* Def. Ex. 2.001; Tr. 7/18/2025 at 69. The report indicates that Oleg and Officer Thurman were tested on four hidden odors ("hides")—one for each of the four drugs Oleg was purportedly trained to detect: methamphetamine, heroin, cocaine, and MDMA. *Id.* All of the hides were inside an MPD building, and none were in vehicles. The USPCA standards require testing on five vehicles. Def. Ex. 15 at 3. Although Officer Thurman testified that he and Oleg were tested on five vehicles for their initial certification, the records contradict that. Def. Ex. 2.001.

The USPCA standards also require time limitations. Def. Ex. 15 at 3. Although Office Thurman claimed that when he and Oleg were first tested, they were timed, the record does not reflect that the testing on May 27, 2025 was timed. The USPCA standards also note that a scoring system is used, but there is no indication of how Officer Thurman and Oleg were scored. *See* Def. Ex. 15 at 3.

The USPCA also requires yearly certification. In addition to the initial training, Officer Thurman testified that he and Oleg are "recertified" every four to six weeks, which Officer

7

Thurman used to suggest his performance was better than the USPCA standards. Tr. 7/18/2025 at 71. These "recertifications" are documented in the one-paragraph reports labeled "Canine Training Note" and introduced as Defense Exhibit 2. *Id.* at 68. They are not nearly robust enough to substitute for a yearly recertification by USPCA's standards. They did not meet the vehicle requirements, *see* Def. Ex. 2, nor the timing requirements of the USPCA standards. *See id.* at 79 (Officer Thurman noting "we like to think that the dogs can actually find the narcotics within the allotted timeframe," but he was not given or aware of any timeframe requirements). Nor, as with the initial certification, is there any suggestion they were independently administered.

Beyond this testing—which Officer Thurman testified lasts only as long as it takes for the trainers to set up the hides and for him to deploy Oleg, Tr. 7/18/2025 at 68, 80—there is no evidence that Oleg and Officer Thurman do regular training. This further undermines Oleg's reliability. *See Acosta*, 2019 WL 454247, at *14 (concluding dog was unreliable for a host of reasons, including concern about the absence of training records during certain months and the fact that the dogs may receive "as little as two hours of narcotics training per month" when 16 hours per month is recommended); *Harris*, 568 U.S. at 248 (trainer and detection dog worked "four hours each week on exercises designed to keep their skills sharp").

And these are just the flaws apparent when measured against USPCA's standards, which are not robust. Officer Thurman was not familiar with more comprehensive standards for detection dog training, Tr. 7/18/2025 at 56, but the Court can compare the standards set forth by recognized organizations to evaluate the requirements used by MPD. For example, the American Academy of Forensic Sciences' Academy Standards Board approved General Guidelines for Training, Certification, and Documentation of Canine Detection Disciplines ("ASB standards")

in October 2019, and these guidelines were approved by the American National Standards Institute in February 2020. *See* https://www.aafs.org/asb-standard/general-guidelines-training-certification-and-documentation-canine-detection. In addition, a federally funded scientific working group—The Scientific Working Group on Dog and Orthogonal Detector Guidelines ("SWGDOG")—published guidelines in September 2010, which are available on the website for the Department of Justice's National Institute of Justice. *See* https://nij.ojp.gov/library/publications/scientific-working-group-dog-and-orthogonal-detector-guidelines-swgdog.

      Compared to these standards—and the common-sense principles they codify—Oleg's training is even more unreliable. For example, the ASB standards require testing in "mission-oriented assessment environment." ASB at 7; *see also* SWGDOG at 134 (testing should "resemble normal operational searches"). Oleg's normal operational search (or mission) was deployment on vehicles. Of Oleg's 63 deployments before the deployment on Mr. Mickens's car, all but one was on a vehicle (98.4%). However, the testing conducted every four to six weeks after the May 27, 2022 initial "certification" was primarily conducted inside facilities. That testing, thus, did not "resemble [Oleg's] normal operational searches." SWGDOG at 134.

      In addition, both ASB and SWGDOG also provide that some testing should be "double-blind," meaning neither the handler nor the judges who are present know the location of the hides. ASB at 136; SWGDOG at 8. Officer Thurman testified that, while he did not know where the hides were, the judges who were present did. Tr. 7/18/2025 at 77-78, 92. This means it was not double blind. Other courts have found training that is not double blind deficient. *See, e.g.*,

*Jordan*, 455 F. Supp. 3d at 1256.[3]

These standards also provide that handlers should not know the number of hides that were placed during each test. ASB at 7; SWGDOG at 136. And in cases where the canine team knew the number of hides, courts have found the fact a canine was certified insufficient to establish reliability. *See United States v. Griffin*, 2022 WL 2071053, *15 (E.D. Mich. 2022) (where handler knew number of hides required to find during testing, certification alone insufficient to establish reliability, but other factors including previous training with blind searches and at least 16 hours of continuous monthly training supported reliability). Here, Officer Thurman could reliably expect that he and Oleg needed to find four hides—one for each trained odor. Tr. 7/18/2025 at 78-79. More than four hides were used in only 3 of the 23 tests following the initial certification. Def. Exs. 2-013, 2-018, 2-019.

The ASB and SWGDOG guidelines also require that testing use "blanks"—i.e., the dog to be deployed on a location where no odor is hidden. ASB at 7; SWGDOG at 135. The testing records for Officer Thurman and Oleg note when blanks were used. Tr. 7/11/2025 at 71. They were not used regularly, but rather only in a third of tests (8 of the 24 tests, including the initial test on May 27, 2022). *See* Def. Ex. 2-009, 2-013, 2-018, 2-019, 2-022, 2-024, 2-025, 2-028. The ASB and SWGDOG guidelines also require that each testing use "distracters" or odors that the

---

[3] The *Jordan* court relied on expert testimony from Dr. Mary Cablk, who is the ex-wife of Dr. John Sagebiel (the expert called by Mr. Mickens at the hearing in this matter), with whom Dr. Sagebiel worked for many years and coauthored published peer reviewed papers. *Jordan*, 455 F. Supp. 3d at 1249, 1252; Tr. 7/18/2025 at 149; *see, e.g.,* Cablk, M.E. and Sagebiel, J.C., *Field Capability of Dogs to Locate Human Teeth*, Journal of Forensic Sciences, 56(4): 1018-24 (2011); Cable, M.E., Sagebiel, J.C., Heaton, J.S., and Valentin, C., *Olfaction-based Detection Distance: A Quantitative Analysis of How Far Away Dogs Detect Tortoise Odor and Follow It to Source,* Sensors 8(4), 2208-22 (2008).

dog is not trained to detect. ASB at 10; SWGDOG at 135. Only one testing record for Officer

Thurman and Oleg notes the use of a distracting odor. *See* Def. Ex. 2-025. *Cf. Acosta*, 2019 WL

454247, at *5 (N.D. Iowa Feb. 5, 2019) (observing, due to the way a particular training form was

constructed, there was no way to determine whether a distractor was used in a test or if the dog

failed to alert to the distractor and ultimately concluding the dog was unreliable).   Finally,

SWGDOG and the ASB Standards recommend four hours of training a week/ 16 hours a month.

See SWGDOG at 137 (canine should spend a minimum of 4 hours per week in training); ASB

Standards at 10 (recommending 16 hours per month).

The attached Figure 1 summarizes the information contained in Defense Exhibit 2. These

factors demonstrate that Oleg's training was deficient. In fact, his training was particularly

deficient in the last six months before Oleg's deployment in this case, when no vehicles, no

blanks, and no distractors were used during testing.

## 2.  Deployment Pattern and Rewards

In addition to the deficiencies in his training, there is significant "conflicting evidence,"

*Harris*, 568 U.S. at 247, regarding Oleg's reliability in giving his trained alert—which is sitting,

Tr. 7/18/2025 at 63—when he smells one of the four drugs he is trained to locate and only when

he smells those odors. Oleg is primarily a patrol dog, not a detection dog. Between his

certification on May 27, 2025, and his deployment on Mr. Mickens's car on November 26, 2024,

he was deployed just 63 times. Def. Ex. 1. That is an average of twice a month, and sometimes

Oleg went weeks or months without being deployed. *See, e.g., Id.* at 1.051 and 1.052 (no

deployments between March 13, 2024 and May 16, 2024). Officer Thurman testified that he and

Oleg work at least 40 hours a week and often significantly more—narcotics detection was just a

11

small fraction of their work. Tr. 7/18/2025 at 56, 123. This use of Oleg as a "dual purpose dog,"

Tr. 7/18/2025 at 7, undercuts his reliability.

The pattern Officer Thurman uses in the field when deploying Oleg on vehicles also

undermines his reliability. When preparing to deploy Oleg to detect narcotics, Officer Thurman

uses a specific flat collar which he retrieves from the front passenger seat of his patrol car, while

Oleg sit in the back; he then retrieves Oleg's reward toy from the pocket of the driver's door. *Id.*

at 97-98, 110-14. He takes Oleg out of the patrol car and leads him to the front passenger side

tire of the target vehicle. *Id.* at 89-90, 110-14. He tells Oleg to "find drugs" and walks Oleg

counterclockwise around the front of the car. *Id.* When Oleg gives his trained alert of sitting

during testing, he is rewarded with the toy only if Oleg has correctly identified the odor. Tr.

7/18/2025 at 15. In the field, however, Officer Thurman rewards Oleg with his toy and high

praise each time he sits by a target vehicle—usually by the front driver's side tire—regardless of

whether he knows if the vehicle contains one of the four trained drugs. *Id.* at 88-89.

It is not appropriate to start a dog at the same place on a vehicle every time, nor is it

appropriate to reward a dog when it alerts but the handler does not know whether the odor is

present. *See United States v. Griffin*, 2022 WL 2071053, *15 (E.D. Mich. 2022) (handler

testified that he did not reward detection dog after alert because "it would be imprudent to

immediately reward [dog] for alerting because [handler] had no way of knowing whether or not

drugs were actually present in the vehicle—that is, whether [dog] had made a correct or a false

alert"); *United States v. Metts*, 2022 WL 1421370, *10 (N.D. Ind. 2022) (rejecting argument that

dog was unreliable because rewarded every time during training, noting, "In actuality, the

canine's field use underscores that he won't receive a reward merely for alerting; his alert in the

field occurs *without the promise of a reward*, lending it further credibility" (emphasis added)).
As the deployment records (discussed *infra*) confirm, this system of rewarding Oleg has trained
him to sit by cars in the field to obtain his reward, and not because there is an odor of one of the
four trained drugs in the car.

### 3.  The November 26, 2024 Deployment

Reviewing the video of Oleg's deployment on Mr. Mickens's car on November 26, 2024
confirms that the alert that day was not reliable. The video of the deployment of Oleg on
November 26 shows the same pattern described above: starting Oleg at the front passenger side
tire, and then, in less than ten seconds, Oleg sitting by the driver's side tire. *See* Def. Ex. 10 at
18:18:38 to 18:18:47. During that 10 seconds, he is not sniffing the car, but is distracted and
walks away from it. *Id.* After Officer Thurman pulls him back on track, his attention again is
diverted and is not on sniffing the car. Oleg then begins to sit before even arriving at the seam of
the driver's door, where any odors from the car would be emanating. *Id.*; Tr. 7/18/2025 at 106.
The BWCs of Officers Sparrow, Powell, and Gramieri provide the clearest view of Oleg's lack
of attention and failure to even sniff the car. *See* Def. Ex. 6, 7 & 11 at 18:18:38 to 18:18:47.
Oleg's lack of attention is particularly apparent when contrasted with video of a reliable dog
working odor on a vehicle. *See* Def. Ex. 100; Tr. 7/18/2025 at 165-71.

Office Thurman's conduct on November 26, just before deploying Oleg, let the dog know
that an opportunity to play with his reward toy was available. Officer Thurman is seen on the
BWC videos retrieving the flat collar that he uses for deployments and the reward toy from the
front of his patrol car, while Oleg was in his cage in the back seat. *See* Def. Ex. 10 & 11 at
18:17:00 to 18:17:16. Officer Thurman then stood near the driver's door and tossed the toy back

to Officer Gramieri, who was standing behind the patrol car. *Id.*; Tr. 7/18/2025 at 100.[4] When Officer Thurman opened the rear passenger door to let Oleg out, he was ready to get that toy. Def. Ex. 10 at 18:17:16 to 18:17:45.

In fact, Officer Thurman's own words on the BWC video suggest that he was confident that Oleg would sit by the car and "alert," regardless of what Oleg smelled. When the officers initially called for a dog, they asked for a gun dog because of Mr. Mickens's prior CPWL conviction—not a narcotics dog based on anything the officers observed, as Officer Dabney claimed during the suppression hearing. Def. Ex. 5 at 17:53:30; Def. Ex. 40 (radio run). As the four officers who were initially on the scene debated whether to have the narcotics dog deployed or wait for the gun dog, Officer Thurman said, "If we do the drug dog, you guys are going to bail on the gun dog, right?" Tr. 7/18/2025 at 96. He then stepped away to call off the gun dog. *Id.* Of course, if Oleg did not alert, the officers would want to run a gun dog, since firearm possession was what they were initially concerned about. But because Oleg consistently alerts when deployed on a vehicle, regardless of what is inside it (*see infra*), Officer Thurman knew there would be no need to deploy a gun dog as well.

### 4. The January 8, 2025 Deployment

The BWC of Oleg's January 8, 2025, deployment only underscores Oleg's unreliable pattern when working in the field. On January 8, 2025, Oleg was deployed on a different vehicle. The video of that deployment confirms Officer Thurman's consistent pattern of starting Oleg at

---

[4] Officer Thurman would not agree that Oleg could see the toy being tossed, but the conclusion is inescapable from the video evidence—Oleg knew he had an opportunity to play with that toy, and all he had to do to get it was to sit next to the vehicle.

the front passenger side tire and walking him counter-clockwise around the front of the car, with Oleg sitting near the front driver's side tire within ten seconds, without appearing to pay attention to sniffing the car.[5] *Compare* Def. Ex. 10 at 18:18:38 to 18:18:47 *with* Def. Ex. 12 at 13:41:28 to 13:41:38. A side-by-side comparison demonstrates the stark similarities:



All this underscores that the government has not met its burden to prove Oleg is reliable.

---

[5] The January 8, 2025 video is the only other video of a deployment of Oleg that the government would disclose to Mr. Mickens's counsel.

Instead, the evidence suggests that, because he is being consistently rewarded in the field even when his trained drugs are not present, Oleg has unlearned the connection between the presence of the odors of his trained drugs and his sit response. Indeed, he is not even paying attention when he is supposed to be detecting the odor. Instead, Oleg is sitting to get his toy.

### 5. Deployment Error Rate

In addition to the inadequate training, the use of poor deployment techniques, and the lack of engagement in the deployment on Mr. Mickens's car, the records of Oleg's deployment history and very high false positive rate demonstrate he is unreliable. *See* Def. Ex. 1. In *Harris*, the Supreme Court noted that "field data . . . *may* markedly overstate a dog's real false positives" and "[t]he better measure of a dog's reliability . . . comes away from the field, in controlled testing environments." *Harris*, 568 at 246 (emphasis added). The Court, however, acknowledged that in some circumstances evidence of the dog's history in the field may be relevant. *Id.*; *see also S.H. v. District of Columbia*, 270 F. Supp. 3d 260, 276 (D.D.C. 2017) (actual experience is properly consider in totality of circumstances that inform probably cause determination). In this case, the overwhelming evidence from the deployment records—particularly when considered in combination with the deficient training and video evidence of Oleg's patterning and lack of attentiveness—make plain that the government cannot meet its burden of demonstrating K9 Oleg was reliable.

Here, the deployment records show much more than the Court had in *Harris*. In *Harris*, the defense challenged the K9 team's error rate based only on two searches of the defendant's vehicle. 568 U.S. at 242. In contrast, the Court has the records for each of Oleg's 63 deployments

prior to the search of Mr. Mickens's car. *See* Def. Ex. 1.[6] All but one of the 63 deployments

involved a vehicle. *See* Def. Ex. 1-060 (deployment at Youth Detention Center). Oleg did not

alert in just 10 of the 62 deployments on vehicles. *See* Def. Exs. 1.008, 1.012, 1.023, 1.042,

1.046, 1.051, 1.052, 1.059, 1.061, 1.063. And, in two of the 52 deployments during which Oleg

alerted, the vehicle was not searched. *See* Def. Exs. 1.013 (police seized car and applied for a

warrant "which was declined by USAO"), 1.017 (police "will be applying for a search

warrant").[7] Setting aside the deployment at the Youth Center, the ten non-alerts, and the two

alerts with no searches—because without searches the accuracy of these alerts cannot be

determined—the Court should look to the 50 remaining deployments to consider Oleg's

reliability. Tr. 7/18/2025 at 122. Officer Thurman claimed that drugs were found in "a majority"

("80 to 90 percent") of the searches when Oleg gave an alert. *Id.* at 25. The records show the

exact opposite.

The 50 cases in which Oleg was deployed, alerted, and officers conducted a search can be

divided into five categories:

> (1) **trained drug found** – one of the four trained drugs (cocaine,
> heroin, methamphetamine, MDMA) was found as evidenced by a
> field test;

> (2) **maybe trained drug found** – a powder substance that may
> have been one of the four trained drugs was found but no test

---

[6] As noted at the hearing on July 18, 2025, on two occasions Officer Thurman deployed Oleg on two different cars at the same scene and prepared one report describing both searches. Tr. 7/18/2025 at 118-19. Defense Exhibit 1 includes two copies of each of those reports, one for each deployment, for ease of reference in describing the results of the deployments. *See* Def. Exs. 1.032 & 1.033; 1.041 & 1.042; Tr. 7/18/2025 at 119.

[7] Def. Ex. 1.017 notes that police "will be applying for a search warrant" but the report contains no record of the result. A search of D.C. Superior Court filings reflects no charges filed in relation to this CCN number. *See* Def. Ex. 300 at ¶ 7.

confirmed the presence of the trained drug;

(3) **residue** – only residue of a substance was found and no test was performed to identify the substance;

(4) **non-trained drug** – a narcotic that was not one of the four trained drugs was found; and

(5) **no drugs** – no narcotics were found.

Tr. 7/18/2025 at 125-127.

The first category (trained drug found) would support a reliable alert, but only five (10%) of the deployments resulted in finding a trained drug as supported by a field test. *See* Def. Exs. 1.022, 1.031, 1.041, 1.044, 1.045.

The second category (maybe trained drug) arguably could support reliability, although there is no reported evidence of a field test or any other analysis confirming the identity of the substance. This category includes five deployments. *See* Def. Exs. 1.003 (72 grams of a white powder substance), 1.010 (a small white rock and loose white powder), 1.029 (small amount of brown powder), 1.036 (clear pill with brown powder), 1.057 (yellow rock). A search of D.C. Superior Court filings reflects no charges filed in relation to the CCN numbers in those matters, so no drug analyses could be found. *See* Def. Ex. 300 at ¶ 7. The substances could have been a narcotic (or a non-narcotic) that Oleg was not trained to identify—such as fentanyl. Nonetheless, even assuming that each of these substances was one of the four trained drugs, these five deployments when added to the five deployments above bring the total number of alerts with accurate (or possibly accurate) results to ten out of 50—an accuracy rate of just 20%.

The third category (residue) supports a finding that Oleg is not reliable. In 14 of the 50 deployments resulting in searches, police found only what is described as "residue" of an

18

unidentified substances. *See* Def. Exs. 1.005, 1.007, 1.015, 1.016, 1.019, 1.025, 1.026, 1.028,

1.035, 1.027, 1.043, 1.049, 1.050, and 1.053.[8] There was no testing of the residue in any of these

finds because the amounts were too small to test. The substances could have been any drug,

including fentanyl or another non-trained drug. Plus, even if the substance was a trained drug,

Oleg was not trained to alert to residue quantities of his trained drug. As Officer Thurman

testified, Oleg was consistently trained on a threshold of 5 grams or more in accordance with

USPCA standards. See Tr. 7/18/25 at 12. Five grams, to state the obvious, is many multiples of

any residue quantity.

The fourth category (non-trained drug) also supports a finding that Oleg is unreliable.

Finding a drug other than a drug Oleg is trained to alert to is no different than finding nothing at

all. Non-trained drugs were found in 12 of the searches following an alert by Oleg. *See* Def. Exs.

1.001, 1.021, 1.014, 1.018, 1.020, 1.024, 1.027, 1.030, 1.034, 1.040, 1.048, 1.058.[9]

The fifth category (no drugs) similarly supports a finding that Oleg is not reliable. The

searches following 14 of the deployments resulted in no drugs found. *See* Def. Exs. 1.002, 1.004,

1.006, 1.009, 1.011, 1.032, 1.033, 1.038, 1.039, 1.047, 1.054, 1.055, 1.056, 1.062. These 14

searches alone demonstrate a 28% error rate (14 out of 50). Add in the 12 searches resulting in

non-trained drugs, and the error rate is 52% (26 out of 50). That is worse than a coin flip. Add in

---

[8] Some of these reports state that "small white particles" or a "white substance" was found on an object. Officer Thurman agreed that these notes refer to residue. Tr. 7/18/2025 at 126.

[9] Officer Thurman's report identified as Def. Ex. 1.058 (CCN 24115118) notes that a "green leaf like substance with a white powder substance covering the green weed like substance" was found. The sworn affidavit the government submit in relation to charges filed after that search reports that the powder substance was amphetamines. Def. Ex. 44 (CCN 24115118 affidavit). Oleg does not alert for the odor of amphetamines. Tr. 7/18/2025 at 127.

the 14 searches resulting in only residue, and the error rate is 80% (40 out of 50)—much worse

that a coin flip and undeniably unreliable.

Officer Thurman claimed that the fact that no drugs were found when Oleg gave an alert

did not make him inaccurate because Oleg alerts to the presence of residual odors. Tr. 7/18/2025

at 25. However, Oleg was trained on a 5-gram threshold odor of drugs that were actually present.

Indeed, as Officer Thurman testified, Oleg was trained to find narcotics, not find where narcotics

used to be. Tr. 7/18/2025 at 72. This, of course, needs to be true for Oleg's alert to be a reliable

indicator of probable cause. After all, Police cannot obtain a warrant by telling a magistrate that

an informant told them where drugs *used to be*. Police can search only locations where there is

probable cause to believe evidence of a crime is actually located. The attached Figure 2

summarizes the deployment records highlighting Oleg's remarkably high false alert rate.

Oleg's training does not compensate for this failure rate and cannot support a finding of

reliability notwithstanding it. As explained above, that training does not meet even the lax

USPCA standards MPD purports to follow. And, even if it did, Oleg was not regularly trained on

vehicles, severely undermining any assurance proper training could give the Court that Oleg is

sitting in the field due to the presence of his trained threshold odors and not something else.

A chronological summary of the information contained in Defense Exhibits 1 and 2 in the

attached Figure 3 confirms that the periodic testing could not compensate for any of the false

alerts. In the ten months prior to the search of Mr. Mickens car, the only *possibly* accurate alert

was on June 22, 2024, when police found "[a] small yellowish rock like substance was located in

the driver's seat, however, the officers did not have a narcotic test kit to identify what the rock

like substance was and therefore there was no recovery of narcotics." Def. Ex. 1.057. Yet, during

those ten months, Oleg was repeatedly rewarded for sitting next to cars when no trained drug

was found in those cars. He was trained on cars just once during that time period, on May 15,

2024. Def. Ex. 2.032. Although the testing record indicates that Oleg alerted to the cars with the

hidden odors on that date, Oleg was not tested on cars that did not contain a hidden odor to

determine if he would give a false alert. And his subsequent field performance demonstrates that

Oleg continued to give false alerts in the field. *See* Def. Ex. 1.053 (alerted and only a sandwich

bag with white powder residue was found); Def. Exs. 1.054, 1.055, 1.056 (alerted and police

found no narcotics in the vehicle); Def. Exs. 1.058 (alerted and marijuana and amphetamines, but

no trained drug found), 1.062 (alerted and nothing found).

When evaluating this evidence, the Court should consider whether a warrant would be

issued based on information from an informant with the same accuracy rate as Oleg. For

example, if instead of Oleg's alert, the police were told by an informant that Mr. Mickens's car

contained contraband on the night of the search, would the Court issue a warrant for the car if the

warrant affidavit explained that the informant had previously given information about the

presence of contraband in 50 cases, but police found what the informant reported in just 10 of

those cases? Of course, not.

**6. Expert Testimony**

At the July 18, 2025 hearing, the defense introduced the expert testimony of Dr. John

Sagebiel. Tr. 7/18/2025 at 148-210. Dr. Sagebiel has a Ph.D. in environmental chemistry. He has

extensively studied the science of olfaction and detector dogs, beginning in 2000 or 2001, and he

has published articles related to detector dogs in peer reviewed scientific literature. *Id.* at 148-49.

Although he has not personally been a detection dog handler, he has actively participated in

training detection dogs. *Id.* at 150-53. He has consulted as an expert in the field on detection

dogs on dozens of cases and testified in approximately five cases. *Id.* at 153. He has never had a

court refuse to qualify him as an expert in the field of detection dogs. *Id.* Given his experience,

the Court should qualify him as an expert in detector dog training, deployment, and reliability.

The government challenged Dr. Sagebiel's qualifications based primarily on the

government's allegation that he did not testify in a couple of the cases listed in his expert notice.

*Id.* at 179-189. The government offered no evidence that Dr. Sagebiel did not testify in these

cases, but rather suggested through questioning that government counsel was unable to confirm

that he testified. *Id.* Those unsubstantiated questions are not evidence.[10] The government has

offered no evidence to suggest that Dr. Sagebiel is not trained and experienced in the field of

detection dogs as he testified. And an expert can be properly qualified even if he has never

testified before—otherwise no expert could ever testify for the first time.   Dr. Sagebiel's

testimony, therefore, should be admitted.

Dr. Sagebiel's expertise confirms what is set forth above: the government has not

demonstrated that Oleg is well-trained and reliable. Officer Thurman's practice of rewarding

Oleg every time he alerts in the field, regardless of whether or not a trained drug was found,

trained Oleg to alert for something other than one of the trained odors. As Dr. Sagebiel

explained, "dogs associate that reward with something. And if you are not absolutely 100 percent

certain that that something is a target odor, you have just trained that dog to do something and

---

[10] Moreover, Dr. Sagebiel candidly disclosed to defense counsel that he had never prepared a list
of his prior testimony before, that this was not something he had consistently kept records of
previously, and that he did his best based on his invoicing records (which charge the same hourly
rate for testimony and other case-related work).   Any error in his notice should be blamed on
defense counsel and not Dr. Sagebiel.

you don't know what that something is." Tr. 7/18/2025 at 155, 157-58. Rewarding the dog for every alert in the field degrades the performance of the detection team. *Id.* at 158, 171-72.

Officer Thurman's use of a pattern in deploying Oleg also degraded Oleg's performance. By using a consistent pattern, he taught Oleg to follow that pattern rather than "truly work odor." *Id.* at 159, 172-73.

Dr. Sagebiel also confirmed that the testing reported in the "Training Notes" (Def. Ex. 2) do not provide reassurance that Oleg's performance in the field was reliable. *Id.* at 165. First, Oleg is trained as a "dual purpose dog," making him less effective. *Id.* at 208. Second, a handler should not know the number of hides the team is required to find and the testing should be done double blind. *Id.* at 159, 163. Here, Officer Thurman and Oleg consistently were asked to find four hides and testing was not done double-blind. *Id.* Trainings also should be "train as you go. If your deployments are all mostly on vehicles, you should be training mostly on vehicles," but Oleg and Officer Thurman were infrequently tested on vehicles. *Id.* at 159.

In addition, Dr. Sagebiel confirmed that scientific studies have verified that dogs develop threshold concentrations or amounts that they will detect and alert to—they do not detect very low amounts. *Id.* at 160-61 A dog trained on a five or more gram threshold, as Oleg was, would not alert to residue or residual odors *Id.* at 161. This testimony supports a finding that Oleg's failure rate in the 50 deployments discussed above is 80% (with false positives defined as the instances when only residue was found, when non-trained drugs were found, and when no drugs were found). *Id.* at 161, 175-77.

Finally, Dr. Sagebiel confirmed what the video of Oleg's deployment on November 26, 2025 clearly shows—Oleg was not actively working odor nor engaged in detection when he sat

23

next to Mr. Mickens's car. *Id.* at 165-171.

In sum, the government cannot meet its burden to show Oleg is reliable. Instead, the evidence shows the opposite:   Oleg is an unreliable dog who alerts regardless of whether his trained odor is present.

### b.   The Dog-Sniff Search was Otherwise Unlawful

Although the Supreme Court has held that "[a] dog sniff . . . that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment," the dog sniff in this case was materially distinguishable and did violate the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 410 (2005). Unlike a sniff search by a dog trained to detect only contraband, a sniff-search of a vehicle by a dog trained to detect lawful items in addition to unlawful ones is a search requiring probable cause. *See, e.g., People v. McKnight*, 446 P.3d 397, 400 (Colo. 2019) (holding that sniff-search by canine trained to detect both marijuana (which had been legalized) and other drugs required probable cause); *see also Commonwealth v. Devoe*, 124 N.E.3d 706 (Mass. App. 2019) (unpublished) (holding that cases about drug sniffing dogs were not controlling but ultimately avoiding the question of whether a sniff by a dog trained in detecting firearms and explosives was a search); *United States v. Centeno-Gonzalez*, 989 F.3d 36, 47 (1st Cir. 2021) (similar).

Even if the Court could find that Oleg was well-trained and reliable—a finding that, as detailed above, is not supported by the record—Oleg was not trained to alert only to illegal contraband. In addition to heroin, cocaine, and MDMA, Oleg was trained to alert to methamphetamine. Tr. 7/18/2025 at 63. Liquid methamphetamine is a Schedule II drug because it has currently accepted medical uses but a high potential for abuse, and other forms of

methamphetamine are Schedule III drugs because they have accepted medical uses and some potential for abuse. *See* 21 U.S.C. § 812(b)(2), (b)(3), Schedule II(c), Schedule III(a)(3). As a Schedule II and III substance, methamphetamine can be lawfully prescribed to treat medical conditions, and if lawfully prescribed, can be lawfully possessed. Currently, methamphetamine is lawfully produced as Desoxyn and prescribed to treat obesity and Attention Deficient Hyperactivity Disorder (ADHD). *See https://www.dea.gov/factsheets/methamphetamine.*

K9 Oleg has not been trained to distinguish between lawful and unlawful methamphetamine. Tr. 7/18/2025 at 65-66. Because K9 Oleg could alert to lawfully prescribed methamphetamine in the form of Desoxyn, to deploy Oleg, the government needed probable cause to believe that contraband—rather than a lawful prescription—was contained in the car. As discussed above, the officers had no evidence to support probable cause here. This is particularly true because the police officers saw a prescription pill bottle in the car before they searched. Tr. 7/11/2025 at 40, 83. The police had no information that the bottle contained anything other than a legal prescription. *Id.* The police could not see the name of the drug prescribed on the bottle and did not know if it was Desoxyn. For this additional reason, Oleg's alert did not provide probable cause to search Mr. Mickens's car.

## II.  Police Unlawfully Seized Mr. Mickens's Car without Probable Cause

Even before the illegal search of Mr. Mickens's car, officers unlawfully seized his vehicle without probable cause or reasonable suspicion.

### a.  The Police Seized Mr. Mickens Car

A Fourth Amendment seizure of a person occurs when "a reasonable person" in the defendant's position "would have believed that he was not free to leave." *United States v.*

*Mendenhall*, 446 U.S. 544, 554 (1980). When determining whether a reasonable person would have felt free to leave, courts in this circuit have found the following facts significant: the number of officers on the scene, *United States v. Mabry*, 997 F.3d 1239, 1245 (D.C. Cir. 2021); *United States v. Jones*, 142 F. Supp. 3d 49, 58 (D.D.C. 2015); the time and place of the encounter (night is more coercive), *see United States v. Delaney*, 955 F.3d 1077, 1083 (D.C. Cir. 2020); whether the officers exited their car, *United States v. Carter*, 2020 WL 3893023 *5 (D.D.C. 2020), were wearing tactical vests, *United States v. Gibson*, 366 F. Supp. 3d 14, 28 (D.D.C. 2018), had visible weapons, *United States v. Lloyd*, 868 F.2d 447, 450 (D.C. Cir. 1989), targeted the defendant or made him the focus of their attention, *Delaney*, 955 F.3d at 1081, or blocked the defendant's ability to exit, *Delaney*, 955 F.3d at 1081; *Winecoff*, 2021 WL 6196999, at *5. Indeed, blocking a person's vehicle or movement is often considered a dispositive indicator that the person is not free to leave. *See, e.g., Delaney*, 955 F.3d at 1083 (finding that parking a police cruiser three feet from the nose of a car and partially blocking is "highly suggestive of a stop"); *United States v. Bryant*, 111 F.4th 105, 110 (D.C. Cir. 2024) (individual stopped when officers blocked path from both directions); *Winecoff*, 2021 WL 6196999, at *5 ("the Court concludes that the officers made a show of authority sufficient to implicate *Terry* when the unmarked cruiser came to a stop diagonally in front of the burgundy SUV, which the defendant had recently entered."); *United States v. Johnson*, 212 F.3d 1313, 1317 (D.C. Cir. 2000) (if the accused's "car had been blocked, he would have been stopped"); *see also United States v. Gray*, 2021 WL 2209462, at *8 (D.D.C. 2021) (government conceding, and court finding, that "since officers approached the defendant from both sides, leaving was not an option" and "a reasonable person in that situation would not have felt free to leave").

26

While there is ample case law about the seizure of a person, there is surprisingly little case law about the seizure of property, particularly when the property in question is a vehicle. At its most basic level, the Supreme Court has explained that "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). And it stands to reason that many of the factors that govern the seizure of a person due to limits on their freedom of movement also govern the seizure of a vehicle, whose entire purpose is to facilitate people's movement and travel. Indeed, what little case law there is indicates that a vehicle is seized, for example, when law enforcement blocks its path. *See, e.g.*, *United States v. Harger*, 313 F. Supp. 3d 1082, 1087 (N.D. Cal. 2018); *United States v. Nunn*, No. 14-CR-00636-TEH, 2015 WL 3764181, at *4 (N.D. Cal. June 16, 2015). And, like here, a vehicle is seized when officers stay with a vehicle until a drug sniffing dog arrives. *See United States v. Burton*, 288 F.3d 91, 101 (3d Cir. 2002); *People v. Tallent*, 174 P.3d 310, 314 (Colo. 2008) (vehicle seized where officers took actions including "st[anding] watch over the car" while the scene was secured). Indeed, even in cases where an individual has diminished their possessory interest in an item (luggage, package) by turning it over to a third party, if law enforcement's brief detention of the item results in a delay in it reaching its destination—that constitutes a Fourth Amendment seizure. *See, e.g.*, *United States v. Va Lerie*, 424 F.3d 694, 706 (8th Cir. 2005) (en banc) ("[I]f law enforcement's detention of checked luggage delays a passenger's travel or significantly impacts the passenger's freedom of movement, the Seizure Clause is implicated").

Police body-worn camera (BWC) videos demonstrate that four uniformed police officers—Officer Anthony Gaton-Garcia, Officer Lamond Sparrow, Officer Kenan Thomas-

Bartley, and Officer Divonnie Powell—surrounded Mr. Mickens's car no later than 5:49 p.m.

(17:49:35 hours) on November 26, 2024. *See* Def. Ex. 3 (Officer Gaton-Garcia's BWC video

starting at 17:49:36); Def. Ex. 5 (Officer Thomas-Bartley's BWC video starting at 17:49:35);

Def. Ex. 6 (Officer Sparrow's BWC video starting at 17:49:37); Def. Ex. 7 (Officer Powell's

BWC video starting at 17:49:35). These four officers were patrolling together that night in a

marked police car, and they were the first four officers to approach Mr. Mickens's car. *Id.*[11]

Approximately five minutes later, Officer Dabney arrived in a second marked police car

driven by Officer Hargrove. Def. Ex. 5 at 17:53:30. A minute later, a third marked police car

arrived and parked behind Officer Hargrove's car, although the occupants appeared to stay in the

car. Def. Ex. 5 at 17:54:17. A fourth marked car arrived seconds later, driven by Sergeant

Matthew Hiller with Officer Vijay Sharma in the passenger seat, both of whom got out of the car

and approach Mr. Mickens's car and the other officers. Def. Ex. 9 at 17:54:35. These eight police

officers—all in uniform, wearing tactical vests, and armed—then stood near or walked around

Mr. Mickens's car and the general area where the car was parked for approximately 21 minutes

while waiting for K9 officers to arrive. *See* Def. Ex. 3 at 18:10:35; Tr. 7/11/2025 at 16-18.

While they were waiting for the K9 officers, one of the marked police cars was double

parked in front of Mr. Mickens's car, and the three other marked police cars were parked behind

it. *See* Def. Exs. 16, 17; Tr. 7/11/2025 at 68-69. The eight police officers who got out of their

cars stood around Mickens's car on the driver's side in the roadway and on the passenger side

---

[11] Although all four officers were out of their police car when the videos begin at 5:49 p.m., ten minutes later, at 5:59 p.m. (17:59:40 hours), Officer Gaton-Garcia told Officer Dabney, "we been here for ten minutes or so," confirming that the officers arrived not long before the videos begin. *See* Def. Ex. 3, 7 & 8 at 17:59:32-17:59:43.

near the sidewalk. *See* Def. Exs. 3-9, 20-29; Tr. 7/11/2025 72-76. They looked into the vehicle

with flashlights and at various points leaned onto the car to get a better view. *See id.*

       This was a seizure. These uniformed officers and their vehicles surrounded

Mr. Mickens's car, blocking any egress. The police vehicles were parked in front of and behind

Mr. Mickens's car (and directly in front of Mr. Mickens's car was an additional parked vehicle).

*See* Ex. 32. Numerous officers stood in the street and on the sidewalk on the driver's and

passenger's side of the vehicle at various times, further preventing it from pulling away. *See* Exs.

31, 43.

 



       The officer's actions were also self-evidently targeted at the vehicle. As noted, the

officers repeatedly looked at Mr. Mickens vehicle, leaned on it, and peered into it. They took no

such actions with respect to the other vehicles in the area.

Mr. Mickens saw this happening. While officers surrounded the car, Mr. Mickens was inside the house across the street. Tr. 7/11/2025 at 31, 79. The officers on the scene could see people in the window of the house looking out, who they were able to assume was Mr. Mickens. *Id.* at 79-80. As Officer Dabney admitted, "obviously, because of the amount of officers we had on the scene and we're in marked vehicles with our flashlights, kind of looking into the passenger compartment, that anyone in the residence would know that law enforcement is on the scene." *Id.* at 80-81. The man who was with Mr. Mickens that night confirms that they were looking out the window and saw the police presence. *See* Def. Ex. 300 at ¶ 6.

A reasonable person in Mr. Mickens shoes would not have felt free to get in his vehicle and drive away—the core purpose for which someone has a vehicle. This is so for many reasons, including: the uniformed officer's obvious focus on Mickens's vehicle and only his vehicle, the fact additional officers continued to arrive until there were four marked police vehicles on scene (indicating an obvious escalation in police activity), and the fact that all those officers continued to linger in the area and look at the vehicle—surrounding it, leaning on it, and peering into it— for over 20 minutes. Indeed, although the test is an objective one, it is notable that, according to Mr. Jones who was with Mr. Mickens that night, Mr. Mickens wanted to drive away in his car but did not feel he could do so. *See* Def. Ex. 300 at ¶ 6. In other words, the officer's actions delayed Mr. Mickens's travel and interfered with his property interest in his vehicle.

At the hearing on July 11, 2025, Officer Dabney argued that Mr. Mickens could have maneuvered his car out from its parked location without the police cars moving. Tr. 7/11/2025 at 77. This claim ignores several important facts. First, it was not just the vehicles that blocked Mr.

30

Mickens's car in. It was those vehicles in combination with the officers standing around, leaning on, and peering into his vehicle that blocked his car's exit. *See* Def. Ex. 31, 43. Second, once the K9 units arrived, the officers blocked off the street entirely with their vehicles. Tr. 7/11/2025 at 48, 70-71; Def. Ex. 19; Def. Ex. 3 at 18:15:55 to 18:16:50. So, even if the test were just where the police vehicles were, Mr. Mickens's car was still blocked in. All this occurred prior to the canine Oleg alerting on the vehicle and amounted to a seizure.

Officer Dabney also claimed that, despite the presence of the police cars and officers waiting for the K9 officers to arrive, Mr. Mickens would have been free to take his car. Tr. 7/11/2025 at 172. This is irrelevant. A seizure is judged from the perspective of reasonable person in the defendant's shoes. An officer's privately held belief is not the test. As, noted, a reasonable person looking at the sustained, concentrated police presence surrounding and guarding the car would not have thought they could simply walk up and take it. In any event, Officer Dabney agreed that once the K9 officers arrived and began to "the track of the vehicle," Mr. Mickens would not have been free to take the car. Tr. 172, 174. At that point, before the K9 alert, the car was unequivocally seized.

### b. No Reasonable Suspicion Or Probable Cause For Seizure Because Officer Dabney's Testimony is Not Credible

Police officers need reasonable suspicion to temporarily detain evidence for investigative purposes. *See United States v. Place*, 462 U.S. 696, 706 (1983); *United States v. McBride*, 676 F.3d 385, 392 (4th Cir.2012). A more sustained detention requires probable cause. *California v. Acevedo*, 500 U.S. 565 (1991) ("[I]f the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle.").

31

The government called Officer Dabney to testify about how he and his fellow officers came to surround Mr. Mickens's vehicle on November 26, 2024. Officer Dabney testified that, before the officers ever approached Mr. Mickens's car, he saw Mr. Mickens park on Adrian Street and then saw an individual come out of a house at 763 Adrian Street, approach Mr. Mickens as he sat in the driver's seat of the car, and engage in a conversation with Mr. Mickens at the driver's window. Tr. 7/11/2025 at 21-22. Officer Dabney testified that he entered the tag number for the car into the DMV database and learned that it was registered to Mr. Mickens and then entered Mr. Mickens's name into a police database and obtained a photograph of him, confirming that he was the driver. *Id.* at 22-24. Officer Dabney testified that, although police could not hear the conversation between Mr. Mickens and the other individual, "[b]ased upon that contact, we believed that there may possibly be a drug transaction occurring." Tr. 7/11/2025 at 25. According to Officer Dabney, after seeing the man at Mr. Mickens's window, police officers pulled their cars behind Mr. Mickens's car, and Mr. Mickens exited the car and ran into the house located at 763 Adrian Street. Tr. 7/11/2025 at 26-27. Although Officer Dabney conceded that they "had no reason to pursue" Mr. Mickens, he claimed that the conversation between Mr. Mickens and this other man, in combination with his claim that Mr. Mickens ran when police pulled up supported "reasonable suspicion." *Id.* at 27, 41-42.

Officer Dabney's testimony is not credible. It is contradicted by the BWC videos of the other officers, his own BWC video, the police radio communications, his prior testimony, and the defense's own investigation. It cannot support a finding of probable cause or reasonable suspicion.

**Officer Dabney's lies about driving around the block:**    To begin with, Officer

Dabney was not on the scene at the time Mr. Mickens parked his vehicle and went inside 763

Adrian Street and he witnessed none of the things he claimed. The BWC produced by the

government does not capture law enforcement's initial interaction with Mr. Mickens, because the

officers on the scene did not turn on their cameras during it. But, when the officers did turn on

their cameras while peering into Mr. Mickens's car at approximately 5:49 p.m., Officer Dabney

and his partner Officer Hargrove were nowhere to be seen. They arrive on scene approximately

four to five minutes later. *See* Def. Ex. 5 at 17:53-54.

At the suppression hearing, Officer Dabney claimed for the first time that he and Officer

Hargrove arrived late because, after they witnessed Mr. Mickens purportedly flee into 763

Adrian Street, they drove around the block to see if Mr. Mickens went out of the back of the

house. *Id.* at 33.[12]   This is not true. First, it is contrary to Officer Dabney's testimony during the

preliminary hearing. *See* Tr. 7/11/2025 at 108-09 (recounting how at the preliminary hearing he

was asked "And so you were basically pulled up. Did you just get out of your car, or did you

drive around the block at all anymore?" and responded "No, I just sat in my vehicle.").

Second, this story about driving around the block to look for Mr. Mickens does not make

sense. Officer Dabney claimed that he drove down Adrian Street, toward Texas Avenue, turned

left on Texas Avenue, turned left again at the next intersection onto Ridge Road, turned left

again on G Street, and then turned left again onto Adrian where he parked behind Mr. Mickens

car. *Id.* at 91.

---

[12] Before testifying before this Court, Officer Dabney reviewed the BWC videos, *id.* at 39-40,
and apparently realized that the videos showed that he did not arrive on the scene until nearly
five minutes after other officers were there.



*Adapted from Def. Ex. 35*

But Mr. Mickens entered into 763 Adrian, an attached row house. Driving down Adrian towards Texas is *away* from 763 Adrian. To figure out whether Mr. Mickens exited the back of the house, the officers would have needed to drive in the *opposite* direction, down G street toward Ridge road.

Officer Dabney's story is also debunked by the BWC videos. Officer Thomas-Bartley's BWC video shows Officer Dabney's vehicle turning onto Adrian Street from the opposite direction on G street and making a right rather than the left he claimed. Def. Ex. 5 at 17:51:50 to 17:53:30. Officer Dabney's story cannot be true.

Confronted with this, Officer Dabney changed his story again, claiming that, when he said he turned left on Adrian, he really meant that he drove past Adrian and made a U-turn, then turned right onto Adrian. Tr. 7/11/2025 at 127. Again, this makes no sense. Setting aside the semantic gymnastics Officer Dabney asks the Court to credit, Officer Dabney, by his own

34

admission, was purportedly circling the block before returning to where they had just been. It makes no sense for him to have missed the turn and driven past Adrian Street where the car was parked.

In any event, the BWC proves that the U-turn story is false. Officer Thomas-Bartley's BWC video shows the intersection of Adrian and G Streets for several minutes before Officers Hargrove and Dabney arrived. Def. Ex. 5 at 17:51:50 to 17:53:30. No police car—Officer Dabney's vehicle or otherwise—passes through that intersection to make a U-turn before turning onto Adrian Street. *See id.*

In addition, Officer Dabney testified that he was "obviously driving that whole time" when he and his partner drove around the block. Tr. 7/11/2025 at 91. But Officer Thomas-Bartley's BWC video shows Officer Hargrove getting out of the driver's seat of the vehicle, not Officer Dabney. Def. Ex. 5 at 17:51:50 to 17:53:30. Officer Hargrove's BWC, too, confirms that he, not Dabney, was driving. Def. Ex. 8.

When confronted with this, Officer Dabney made up another false story. He claimed that he and Officer Hargrove stopped to talk to someone else during their drive around the block, then switched seats, then Hargrove finished driving around the block. Tr. 7/11/2025 at 128-130. Again, this defies common sense. At no point in any of his prior statements, including his testimony before the Court, did Officer Dabney mention this entire other interaction. It makes no sense for Officers Dabney and Hargrove, if they were driving around the block to look for a fleeing Mr. Mickens as Dabney claimed, to stop and have a chat with someone else entirely.

The BWC also contradicts this latest version of Officer Dabney's story. As noted, Officer Dabney claims he and Officer Hargrove drove around the block from Adrian Street to Texas Avenue, to Ridge Road, to G Street, and back to Adrian Street. That route only has one stop sign. *See* Def. Ex. 300 at ¶ 8. Officer Hargrove's video,[13] however, shows that at 17:51:45, Officer Hargrove got in the vehicle to begin driving. *Id.* With Officer Dabney in his passenger seat, Officer Hargrove then drove for two minutes, passing through at least *four* stop signs. *See* Def. Ex. 8 at 17:52:02, 17:52:20, 17:52:27, and 17:53:07.



The truth is much simpler than Officer Dabney's convoluted lies. One of the officers actually on the scene with Mr. Mickens car—Officer Thomas-Bartley—broadcasted the

---

[13] Unlike Officer Dabney who did not timely activate his BWC, Officer Hargrove activated his camera when he stepped out of the car with Officer Dabney on Adrian Street. *See* Def. Ex. 8 at 17:53:37. Officer Hargrove's BWC video includes the video without audio buffer that starts two minutes earlier at 17:51:38. Def. Ex. 8.

notification, "700 Adrian Street" at 17:51:44. Def. Ex. 5 at 17:51:44. At 17:51:45, just a second

after the broadcast, Officer Hargrove got in the vehicle to begin driving to Adrian with Officer

Dabney. Def. Ex. 8 at 17:51:45. In fact, officers are recorded on the videos later joking about

who knew the location of Adrian Street, and Officer Hargrove said, "I heard Adrian and I'm

here," *id.* at 17:57:30 to 17:57:50, acknowledging that he heard the notification for Adrian Street,

knew where it was, and that is why he drove there.

**Officers Dabney and Hargrove's questions on scene:**    Officers Dabney and

Hargrove's conversations with other officers once they arrived on scene further confirm that

Officer Dabney's testimony was false. They did not see who got out of Mr. Mickens car that

night or see anyone talking to Mr. Mickens.

When Officers Dabney and Hargrove first walked up to Mr. Mickens's car that night,

Officer Sparrow explained what he and other officers had seen. Def. Ex. 6 & 8 at 17:53:26 to

17:54:00. Speaking to Officer Hargrove, Officer Sparrow explained that they "parked real quick

and went inside the house." *Id.* A few seconds later, Officer Dabney asked Officer Sparrow,

"Where did they go?" and Officer Sparrow explained that Mr. Mickens and the other man who

got out of the car went into the corner house. *Id.* at 17:54:38 to 17:55:00. Obviously, if Officer

Dabney saw Mr. Mickens go into the house, he would not have asked Officer Sparrow where

they went.

Officer Dabney also twice asked other officers to describe the people who got out of

Mr. Mickens car. *See* Def. Ex. 8, 9 at 17:58:48 to 17:59:30; Def. Ex. 3, 4 at 18:17:03 to 18:17:33.

Obviously, if he had seen anyone get out of the car, Officer Dabney would not have needed to

ask other officers for a description. When confronted with this, Officer Dabney again made

something up. He claimed he was just confirming with the other officers what they all saw. *See* Tr. 7/11/2025 at 134, 155. However, the videos of him asking about the descriptions sound nothing like someone confirming details they already know. *See* Def. Ex. 8, 9 at 17:58:48 to 17:59:30 (Officer Dabney asking, "Hey G, any of the dudes in this car wearing a camouflage jacket?"); Def. Ex. 3, 4 at 18:17:03-18:17:33 (Officer Dabney asking, "Black male, gray pants?" with Officer Gaton-Garcia responding, "No, that's Unc. That's who they were waiting for.").

Officer Hargrove's questions show the same thing. For example, Officer Hargrove can be heard on the BWC asking Officer Gaton-Garcia if he saw who the driver was and if it was Mr. Mickens. Def. Ex. 3 & 8 at 18:19:50-18:20:00. Officer Gaton-Garcia responded that it was Mr. Mickens. *Id.* Obviously, had Officer Hargrove been there to witness Mr. Mickens converse with someone from the driver's seat and run from there to the 736 Adrian St., he would not have needed to ask. The truth is Officers Dabney and Hargrove did not know what the persons who got out of the car look liked, who they were, or where they went because they were not on Adrian Street when Mr. Mickens parked the car.

**The toolbox and what really happened:** All of the above is more than enough to discredit Officer Dabney and make clear that his testimony cannot provide probable cause or reasonable suspicion. But that is not all. The record shows that what Officer Dabney claims to have witnessed never occurred.

Defense investigator, Tyrees Smith, interviewed Ivan Jones, who was with Mr. Mickens when he drove to Adrian Street and parked just before the officers seized the car. *See* Def. Ex. 300 at ¶¶ 5-6.[14] As Mr. Jones explained to Investigator Smith:

---

[14] Officer Dabney claimed that there was only one individual in the vehicle when he purportedly

> Mr. Mickens . . . drove to Adrian Street, S.E. and parked across the
> street from the home of Mr. Jones's uncle. They got out of the car
> immediately upon parking. They did not speak to anyone on
> Adrian Street and no one approached the car while they were
> parking or near the car. After Mr. Mickens and Mr. Jones got out
> of the car, Mr. Mickens got his toolbox out of the trunk of the car.
> Mr. Mickens and Mr. Jones then walked toward his uncle's house.
> Mr. Jones got to the door first and knocked as Mr. Mickens walked
> up behind him. As they waited for Mr. Jones's uncle to open the
> door, a police car with four police officers inside pulled up beside
> them. As the police officers sat in their car, with the windows
> down and the doors ajar, as if they might get out, the officers asked
> Mr. Mickens and Mr. Jones what they were doing. Mr. Mickens
> told them they were going to "Unc's" house. The police then ask
> what was in the toolbox and told Mr. Mickens to show them what
> was in the toolbox. Mr. Mickens showed them that it was just a
> drill in the toolbox. Mr. Jones's uncle then opened the door and
> Mr. Mickens and Mr. Jones went inside.

*Id.* at ¶ 6.

Statements by officers who, unlike Officer Dabney, were on the scene at the time Mr.

Mickens parked his car, corroborate that this is what happened. For example, when the K9

officers arrived on the scene, Officer Gaton-Garcia—who had been there from the beginning—

explained the information they had that had caused them to call the K9 officers.   Tr. 7/18/2025

at 96.[15] As Officer Gaton-Garcia explained it:

> So, he, he's been locked up, he went to the, he was at the trunk,
> doing something real quick when he saw us and he put something
> down and took a toolbox, but there was nothing in the toolbox, but
> he's been locked up multiple times for narcotics. I think you guys
> ran this and it hit a couple of, back in like, what was it, 2024, in

---

saw the suspected drug transaction. But statements officers made on the radio confirm the
officers who were on the scene at the time saw two people get out of the vehicle.   *See* Def. Ex.
41 at 1:03 ("We had two individuals quickly park, step out").

[15]  Neither Officer Thurman nor Officer Gramieri had activated their BWCs at this point, but the
conversation is recorded on the BWC videos from Officers Gaton-Garcia, Sparrow, Thomas-
Bartley, and Powell. *See* Def. Exs. 3, 5, 6, & 7 at 18:11:20 to 18:12:00.

> January, this hit for powder substance, and he had PCP in there
> too.

*See* Def. Exs. 3, 5, 6, & 7 at 18:11:20 to 18:12:00.

Other statements by the Officers corroborate Mr. Jones's version of events and discredit Officer Dabney. As they waited for the K9 units, Officers Gaton-Garcia, Thomas-Bartley, and Powell discussed what they saw and explained it to Officer Sharma, who was standing with them near the car. Def. Exs. 3, 5, 7, & 9 at 18:06:06 to 18:06:54. Motioning and pointing to the trunk of the car, Officer Gaton-Garcia said, "He [(Mr. Mickens)] was doing something, putting something down in the back, in the trunk." *Id.* Officer Thomas-Bartley agreed that he saw a motion near the trunk. *Id.* Officer Gaton-Garcia also noted, "Man, he didn't even bother saying anything about the car. He just went inside. He mind his own business. He was like, 'I'm just waiting for Unc to open the door.' They must have been there for like five minutes before anyone opened the door." *Id.* Officer Gaton-Garcia also later explained to Officer Dabney that the men who got out of the car were waiting for "Unc." Def. Ex. 3 at 18:17:03 to 18:17:33.   *See also* Def. Exs. 3, 6, & 9 at 18:09:40 to 18:10:00 (Officer Gaton-Garcia said, "he parked real quick here then just stepped out. He went up there and then he went to the trunk real quick"; Officer Sparrow said "he grabbed the toolbox"; and Gaton-Garcia agreed, "grabbed the toolbox."); Def. Ex. 3 at 18:00:30 to 18:00:39 (while looking into the car, Officer Gaton-Garcia noted, "there's another drill right here too. Another drill," confirming that officers had seen the first drill in Mr. Mickens's toolbox); Def. Exs. 3, 5, 6, & 7 at 18:11:20 to 18:12:00 (Officer Gaton-Garcia's statement to Officer Thurman that there was "nothing" (no contraband) in the toolbox, confirming that, as Mr. Jones stated, he told Mr. Mickens to show him what was in the toolbox and there was nothing illegal).

Obviously, all of this is inconsistent with Officer Dabney's story. When confronted with this evidence, Officer Dabney claimed that the officers were talking about the toolbox that would be used to break into Mr. Mickens car. Tr. 7/11/2025 at 173. Like with Officer Dabney's other lies, this makes no sense.    To credit him, this Court would have to believe that, when the K9 officer arrived on the scene, instead of explaining to him what had caused them to call for a detection dog, they instead talked to the K9 officers about the law enforcement toolbox they used to get into cars.    And, that law enforcement toolbox would have to have "nothing in" it, and the officer with the toolbox would have to have been "locked up … locked up multiple times for narcotics."    That is clearly not what the officers were saying. Instead, they were explaining what had caused them to call the K9.    Tr. 7/18/25 at 96 (K9 officer testifying that is what he understood the officers to be saying).

The burden falls on the government to establish probable cause or reasonable suspicion. To state the obvious, where a law enforcement officer's testimony is not credible, it cannot satisfy the government's burden.    *See generally* Memorandum Opinion and Order, *United States v. Woodruff*, 22cr219 (JMC) (Mar. 24, 2023) (concluding that officer's claims were not supported by the other evidence in the record, including the BWC, and suppressing); *United States v. Sparks*, 594 F. Supp. 3d 9, 25 (D.D.C. 2022) (concluding there was no reasonable suspicion after refusing to credit officer's testimony where it was "internally inconsistent as well as in conflict with the video evidence"); *see also United States v. Gibson*, 366 F. Supp. 3d 14, 24-27 (D.D.C. 2018) (concluding the government had not met its burden to prove there was no show of authority where defendant's version of events was more credible and consistent with the

other evidence);[16] For all the reasons set out at length above, Officer Dabney's testimony is impeached, rather than confirmed by the record and, thus, the government has failed to meet its burden.

### c. No Reasonable Suspicion Or Probable Cause For Seizure Even if Officer Dabney is Credible

Even if Officer Dabney's testimony could be credited, what he purported to observe does not provide reasonable suspicion much less probable cause. In *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000), the D.C. Circuit "doubt[ed] very much" that when an officer in high-crime area known for narcotics trafficking witnessed a woman lean into a car and hand a man an object, saw the woman then walked away when officers approached, and saw the defendant make a "shoving down motion" that this was enough for reasonable suspicion. *Id.* at 1316. The "facts" here, by Officer Dabney's accounting, closely parallel that case. For that additional reason, the officers lacked probable cause or reasonable suspicion to seize the car.

## Conclusion

For the reasons stated above, Mr. Mickens respectfully submits that the use as evidence of all items obtained from the gray Infiniti must be suppressed, along with any other fruits of the unlawful search and seizure.

---

[16] The officer who could not be credited in *Gibson* was then-officer, now-Sargent, Matthew Hiller, who was driving the third marked police car that arrived on the scene of the seizure of Mr. Mickens's car. 366 F. Supp. 3d at 17.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____
MARY MANNING PETRAS
COURTNEY L. MILLIAN
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500